

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF MISSISSIPPI
SOUTHERN DIVISION

UNITED STATES OF AMERICA,
ex rel. Bryon Faulkner, Relator

Plaintiff

v.

Civil Action No. 1:13cv295HSO-RHW

HUNTINGTON INGALLS INDUSTRIES, INC.

Defendant

*FILED UNDER SEAL*

## COMPLAINT

(Jury Trial Demanded)

*Qui tam* Relator Bryon Faulkner, by his undersigned attorneys, alleges as follows as his Complaint filed under seal herein:

1. This is a civil action brought on behalf of the United States of America against the Defendant named herein to recover treble damages and civil penalties under the False Claims Act, 31 U.S.C. §§ 3729-3732, as amended ("FCA"). Relator Bryon Faulkner, acting on behalf of the United States, brings this civil action under the *qui tam* provisions of the FCA, including 31 U.S.C. § 3730(b-d).

### Venue and Jurisdiction

2. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1345 and 31 U.S.C. §§ 3730(b) and 3732(a).

3. Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) and (c) and 31 U.S.C. § 3732(a), as the Defendant engaged in the unlawful conduct and presented

resulting false claims in, and arising out of, its Ingalls Shipbuilding facility located in Jackson County, Mississippi, and thus within this District and Division.

## The Parties

4. *Qui tam* relator Bryon Faulkner ("Faulkner") is an adult citizen of the City of Vancleave, within Jackson County, Mississippi, where he has resided throughout all of the events described herein.

5. Defendant Huntington Ingalls Industries, Inc. (hereafter, "Ingalls"), is a privately-owned corporation organized under the laws of the State of Delaware, which is authorized to and does conduct its principal operations in Jackson County, Mississippi, through its ownership and operation of the Ingalls Shipbuilding complex located in Pascagoula, Mississippi (hereafter, "the Ingalls shipyard"). It may be served herein through service on its Mississippi registered agent, C T Corporation System, 645 Lakeland East Drive, Suite 101, Flowood, Mississippi 39232. .

## The False Claims Act

6. The substantive liability provision of the False Claims Act, namely 31 U.S.C. § 3729, provides in pertinent part that:

> (a)(1) (A)ny person who (A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval; (B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim; . . . or (G) knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and

> improperly avoids or decreases an obligation to pay or
> transmit money or property to the Government, . . .
> is liable to the United States Government for a civil penalty of
> not less than ($5,500) and not more than ($11,000), plus 3
> times the amount of damages which the Government sustains
> because of the act of that person....
>
> (b) For purposes of this section, the terms "knowing" and
> "knowingly" mean that a person, with respect to information
> (1) has actual knowledge of the information; (2) acts in
> deliberate ignorance of the truth or falsity of the information;
> or (3) acts in reckless disregard of the truth or falsity of the
> information, and no proof of specific intent is required.

### **Factual Allegations**

7.  Faulkner has been a full-time employee of Ingalls, working at its Ingalls shipyard continuously since 1998. In August of 2012, he was promoted to Foreman Shipfitter, and holds that position now. He gained personal knowledge of all of the facts set forth herein through his work at Ingalls.

8.  Continuously from 1998 until the current time, the Ingalls shipyard has been engaged almost exclusively, and during many of those years exclusively, in the performance of ship-building contracts for the United States Navy and the United States Coast Guard. Ships constructed for the Navy during that period include numerous assault ships ("LHAs") and landing ships ("LPDs"), while ships constructed for the Coast Guard include numerous "cutters". At any one time, numerous different ships (or substantial parts of ships) have been simultaneously under construction at the Ingalls shipyard. Each separate ship during the construction period at the Ingalls shipyard is referred to as a

separate "hull", and is assigned a four-digit "hull" number unique to that ship.

9.  To govern the terms of construction for each such ship during each such year, the Navy and Coast Guard each entered contracts with Ingalls which were in the nature of "fixed price with incentives" contracts. A substantial fraction of the compensation for which Ingalls was eligible (and for which Ingalls was ultimately paid) under the terms of each such contract was based on Ingalls' potential eligibility to receive periodic "incentive" payments.

10. As to each such ship "hull" constructed for the Navy and Coast Guard during all such years at the Ingalls shipyard, Ingalls' contractual entitlement to receive substantial, periodic, multi-million-dollar "incentive" payments from both such United States Government agencies was tied or conditioned, by the terms of its contracts with both such agencies, to whether or not Ingalls personnel actually constructed each part or item of any particular hull through an actual expenditure of work hours at or below a number of hours established as a target or budget with respect to each such hull and item. Each such item for each such hull was assigned an hourly target or budget by the contracting parties. Each category of a hull part or item was assigned an "order number" unique to that category of part or item. A single set of ladders and stairs, for instance, was assigned an "order number" of 1111, while a foundation for electrical equipment was assigned an "order number" of 1119, and "main rudder and stern diving planes" were assigned an "order number" of 1901. The order numbers used for this purpose at Ingalls

shipard are included in the list attached hereto as Exhibit A hereto.

11. If an item represented by any one order number for any one hull was in fact constructed (in accordance with the contract's specifications for that order number) at or below a number of "man hours" assigned by the contract to that item and thus that order number, then Ingalls was entitled to receive a periodic incentive payment in substantial amounts (if Ingalls accurately reported that the order number had been achieved and completed at or below that assigned number of hours). If, on the other hand, Ingalls personnel in fact spent more "man hours" than the hourly total or target assigned to that order number in constructing that part or item, Ingalls would not be eligible to be paid an incentive payment attributable to that order number and hull (and the amount of its incentive payment for that period of time would thereby be reduced).

12. Ingalls throughout all such years organized and allocated its supervisory and other personnel based on Ingalls' corporate purpose of receiving the maximum dollars in periodic incentive payments. It did not organize or allocate its supervisory and other personnel according to hulls (with one team or group of employees continually and exclusively working on one hull). Instead, it organized all such personnel based on functions, with each function being the subject of a "department." Relator Faulkner, for instance, has continually worked in the "shipfitters" department, which is assigned a departmental number of "07". The welding department, on the other hand, is assigned a departmental number of "09". All department names and numbers are reflected on the

table attached as Exhibit B hereto. Each such department is headed by a senior Ingalls manager called a "Department Director." As a result of these organizational decisions by Ingalls, any one supervisor within any one department could, on any one day, be engaged in managing work on more than one hull or ship, consistent with Ingalls' departmental organization.

13. Ingalls also organized its compensation arrangements with all of its managerial personnel in all of its construction-related departments according to its corporate goal of receiving the maximum possible incentive payment dollars from the Navy and Coast Guard. A manager credited by Ingalls with causing the completion, within the hourly target or cap, of work on any particular item or order as to any particular hull, was for that reason individually and periodically paid incentive or bonus payments, funded in effect out of incentive payments paid to Ingalls for apparently achieving the same objective. All such managers were therefore individually incentivized by Ingalls to represent that such items or orders had been completed through work at or below the number of hourly caps or targets which made Ingalls itself eligible for an incentive payment for meeting the same hourly caps.

14. All or substantially all of the incentive payments made to Ingalls by the Navy or Coast Guard during such years resulted from and were caused by what is hereafter described as "false time allocations" ordered and made by Ingalls supervisors in an effort to receive individually the incentive payments referred to in the immediately

preceding paragraph.

15. The Ingalls supervisors named in paragraphs below ordered subordinates on a daily basis to write down, on "Daily Time Log" documents purporting to describe accurately the work of a particular foreman's crew during a particular day, four-digit "*hull*" numbers without regard to whether or not the work to be done that day as to those items or orders was in fact done on (or as to) the actual hull represented by that four-digit number.

16. The same Ingalls supervisors named in paragraphs below also ordered subordinates on a daily basis to write down on the same "Daily Time Log" for each foreman four-digit "*order*" numbers without regard to whether or not the work to be done that day during the represented hours was in fact done on (or in fact involved) the order or item represented by that four-digit order number.

17. Though such daily logs were each titled "P O D C Daily Time Log", they were more commonly referred to within the Ingalls shipyard as "Force Reports". Exhibit C hereto is a representative example of such a Force Report. Each "foreman" supervised one "crew", and filled out hours for one Force Report each work day. Each Force Report was designed to describe the hours devoted in the course of the day, by up to ten employees on the same crew, to as many as ten different "jobs" or assignments, each of which would be assigned by supervisors of the foremen each day with numbers for the hull and order to describe each "job" or assignment for the crew to accomplish. Each job

or set of activities was assigned an "op" number or code, which identified which department within the Ingalls shipyard was to perform the work of that job.

18.     The purpose of those routine and intentional mis-allocations of hull and order numbers on the faces of such Force Reports was to avoid accurately admitting that the actual time worked (or to be worked) that day was on hulls and orders as to which the hourly target or cap had already been exceeded (or would soon be exceeded). If hull and order numbers had been accurately assigned to describe which hull or order was in fact being worked on each day, the resulting accurate Force Reports would have revealed that hourly targets or caps were being routinely exceeded for many orders as to many hulls, and neither Ingalls nor its managers would have received periodic incentive or bonus amounts arising out of work performed on those orders and hulls.

19.     But in order to conceal the truth that hourly caps were routinely being exceeded for numerous orders as to numerous hulls (in that the hours actually spent on such orders would in fact have been exposed as actually exceeding the hourly caps set for incentive payment purposes), the Ingalls supervisors named in paragraphs below, on a daily and routine basis, directed subordinates (including individual foremen) to write down on Force Reports numbers of hours allocated falsely to orders and hulls which were not in fact the subject of the work performed (or to be performed) that day. The hour numbers included on the Force Reports generally captured accurately the number of hours worked (or to be worked) by the crew referred to on an individual Fore Report. But the

allocations on the Force Reports of those hourly numbers to hulls and orders did not accurately represent the hulls or orders on which those hours of work were actually performed. The practice described in this paragraph, and in Paragraphs 14 through 18 above, will hereafter be referred to as "false time allocations".

20. Relator Faulkner learned personally about false time allocations at the Ingalls shipyard when he was directed by his own Ingalls supervisors to engage in such conduct soon after becoming a foreman at Ingalls in August of 2012. The first work his crew was assigned was on a Navy hull named Navy LPD 2617. But at the time they were assigned to do their work on a certain order for that hull, all of the hours assigned to that order and hull had already been "used", in that the previous work had previously consumed a number of hours sufficient to hit the hourly cap assigned for incentive purposes to that order and hull. Neal Holden, an Ingalls general foreman who was among Faulkner's supervisors, directed Faulkner to charge the hours his crew would be working to a different hull, namely Navy Destroyer DDX 5405 (though Holden knew that the hours actually being worked were actually on an entirely different hull, namely Navy LPD 2617). When Faulkner later attempted to charge the actual hours accurately to Navy LPD 2617, Holden told Faulkner, "if you don't play the game, you are not going to be a foreman very long." Ingalls General Superintendent Robbie Gardner, a supervisor to Holden, also told Faulkner to engage in such false time allocations. In November of 2012, Gardner in fact threatened to terminate Faulkner for not following such directives,

and Faulkner as a result resigned. Faulkner in the meantime had reported the true facts about the false time allocation practices to an Ingalls internal auditor, who entirely as a result of Faulkner's information began an investigation of false time allocations which resulted in the termination of Gardner, Holden, and the remaining Ingalls supervisors named below, all resulting from an investigation begun only because of Faulkner's information. Faulkner has since been re-instated by Ingalls.

21.   For a substantial number of years, Ingalls Department Directors Pat Burleson and John Young, having been authorized by Ingalls to decide which orders and hulls would be the subject of particular time allocations for work performed in the Shipfitter and Welding Departments, engaged routinely in false time allocations, for which they were terminated by Ingalls in 2013.

22.   For a substantial number of years, Ingalls General Superintendents Danny Goldman and Robbie Gardner, having been authorized by Ingalls to decide which orders and hulls would be the subject of particular time allocations for work performed in the Shipfitter and Welding Departments, engaged routinely in false time allocations, for which they were terminated by Ingalls in 2013.

23.   For a substantial number of years, Ingalls General Foremen in the Shipfitter Department, including Charles Fonte and Neil Holden, each having been authorized by Ingalls to decide which orders and hulls would be the subject of particular time allocations for work performed in the Shipfitter Department, engaged routinely in false

time allocations, for which they were each terminated by Ingalls in 2013.

24. For a substantial number of years, Ingalls General Foremen in the Welding Department, including Robbie Loftin and Jack Forrester, each having been authorized by Ingalls to decide which orders and hulls would be the subject of particular time allocations for work performed in the Welding Department, engaged routinely in false time allocations, for which they were each terminated by Ingalls in 2013.

25. For a substantial number of years, Ingalls Foremen in the Shipfitter Department, including Jasper Williams, Mac McDaniels, Billy Orso, A. D. Johnson, Dave Dantzler, Red Eckhert, John Gill, John Kannan, and David Kitchens, each having been authorized by Ingalls to decide which orders and hulls would be the subject of particular time allocations for work performed in the Shipfitter Department, engaged routinely in false time allocations, for which they were each terminated by Ingalls in 2013.

26. For a substantial number of years, Ingalls Foremen in the Welding Department, including Reubon McCon, Henry Williams, and John Harris, each having been authorized by Ingalls to decide which orders and hulls would be the subject of particular time allocations for work performed in the Shipfitter Department, engaged routinely in false time allocations, for which they were each terminated by Ingalls in 2013.

27. False time allocations were routinely made for a substantial number of years preceding and including 2012, through supervisory directives made within numerous

11

operating departments within the Ingalls shipyard, including (but not limited to) the Pipefitting Department, the Paint Department, the Electrical Department, and the Machinery Department.

28. As Exhibit C hereto reflects, the Force Reports on which Ingalls shipyard management ordered foremen and others under their supervision to record false hull numbers and order numbers all contained the following express certification: "I hereby certify that all information contained in this PODC Daily Time Log is complete and accurate to the best of my knowledge. I understand that the information contained in this Daily Time Log will be used to prepare invoices for submission to the United States government and that the knowing submission of false information may subject me to criminal and/or civil prosecution and penalties."

29. As Ingalls admitted in the printing of that statement on the face of each such Force Report, the hourly numbers stated on each Force Report for each hull and order were indeed "used to prepare invoices for submission to the United States government," in that an accurate reporting of all such hourly numbers was material and essential to any governmental determination of Ingalls' proper legal and contractual entitlement to each periodic incentive payment made by the Navy and Coast Guard to Ingalls during the period addressed above.

30. Because the false time allocations described above caused each such Force Report to be factually false in the hours each attributed to particular hulls and orders,

each such Force Report (and the certification made thereon) by Ingalls was "a false record or statement material to a false or fraudulent claim" which was "made or used" by Ingalls in conjunction with getting paid incentive payments by the Navy and Coast Guard, within the meaning of 31 U.S.C. § 3729(a)(B) of the FCA.

31. The same false time allocations also and inherently caused all later "invoices for submission to the United States government" to be factually false within the knowledge of Ingalls, since as Ingalls admitted on the face of each Force Report Ingalls "used" the hours reported on the Force Reports "to prepare (the) invoices" it submitted. The ultimate invoices were therefore also each "a false record or statement material to a false or fraudulent claim," and were each "knowingly made (and) used" by Ingalls in claiming entitlements to incentive payments (and in causing all such incentive payments to be made).

32. The accuracy of those reported total hours worked on each order and hull was a prerequisite to the legal right and entitlement of Ingalls to be paid incentive payments throughout the years of the false time allocations described above, in that Navy and Coast Guard payment officials relied on the presumed accuracy of the resulting hour reports as material and necessary prerequisites and conditions for any decision by either such agency to make payments to Ingalls of incentive payments for each such order and hull.

33. If Navy and Coast Guard payment officials had known that such hourly

totals were not accurate, no such incentive payments would have been made to Ingalls. All such false hourly totals, and all records and invoices reflecting or affected by such false hourly totals, were material to and a precondition of any entitlement of Ingalls to receive any incentive payment. Because such false hour totals resulting from false time allocations were made, and were used by Ingalls through its invoice records in order to get such incentive payments to be made to Ingalls by the Navy and Coast Guard, such incentive payments were in fact made to and received by Ingalls during all such years.

34. All claims by Ingalls for all such incentive payments during all such years were legally and factually false when made within the meaning of the FCA, and the amounts of all such incentive payments paid to Ingalls were damages to the United States from the payment of claims not legally due.

35. Ingalls having delegated to its Department Directors, and in turn its General Superintendents and General Foremen, authority and discretion to decide which hulls and orders to assign to which Force Reports and related jobs each day, and such management personnel having known of and executed the pattern of false time allocations as described above, knowledge of the falsity of the resulting Force Reports, invoices, and claims for incentive payments as described above was and is attributable to Defendant Ingalls, within the meaning of "knowledge" as defined in the FCA. The knowledge (as so defined) and activities of all such persons, including but not limited to all persons whose names appear above, was all acquired and conducted by all such persons within the scope and course of their work as supervisory and management officials on behalf of Ingalls,

14

and is otherwise legally attributable to Ingalls as an entity.

## COUNT I

### Claim By and on Behalf of the United States under the False Claims Act (Presenting False Claims)

36. Plaintiff realleges and incorporates by reference paragraphs 1 through 35 as though fully set forth herein.

37. This is a claim under the False Claims Act, 31 U.S.C. §§ 3729-33, as amended.

38. The Plaintiff/Relator, Bryon Faulkner, has standing to maintain this action by virtue of 31 U.S.C. §3730(b).

39. By virtue of the acts described herein, the Defendant Ingalls knowingly presented false or fraudulent claims for payment, and knowingly caused false or fraudulent claims for payment to be presented, to officials of the United States Government in violation of 31 U.S.C. § 3729(a)(1)(A).

40. By virtue of the false claims presented or caused to be presented by Ingalls, the United States has suffered actual damages (including all incentive payments made to Ingalls during the ten-year period preceding the filing of this action), and is entitled to recover three times the amount by which it is damaged, plus civil money penalties of not less than $5,500 and not more than $11,000 for each of the false claims presented or caused to be presented, and other monetary relief as appropriate.

## COUNT II

## Claim By and on Behalf of the United States under the False Claims Act
## (False Records or Statements)

41. Plaintiff realleges and incorporates by reference paragraphs 1 through 35 as though fully set forth herein.

42. This is a claim on behalf of the United States under the False Claims Act, 31 U.S.C. §§ 3729-33, as amended.

43. The Plaintiff/Relator, Bryon Faulkner, has standing to maintain this action by virtue of 31 U.S.C. §3730(b).

44. By virtue of the acts described above, and Ingalls' uses of, and activities causing to be used, false records, certifications and other statements of the hours devoted to completion of numerous orders as to numerous hulls as described above, which representations of hours were known by Ingalls to be material to decisions by the Navy and Coast Guard as to whether to pay, and which did cause to be paid, claims for incentive payments for which Ingalls was only eligible if the reported hours had been truthfully reported, Ingalls used such false records, certifications and other statements in getting such incentive payments to be paid by agencies of the United States Government, all in violation of 31 U.S.C. § 3729(a)(1)(B), prohibiting and making actionable the knowing making, use, or causing to be made or used, any false record or statement material to a false or fraudulent claim.

45. By virtue of, and as a result of, the material false records and statements used by Ingalls, the United States has suffered actual damages (including the payments of

all incentive payments to Ingalls as defined above, throughout the ten-year period preceding the filing of this action), and is entitled to recover three times the amount by which it is damaged, plus civil money penalties of not less than $5,500 and not more than $11,000 for each of the false claims presented or caused to be presented, and other monetary relief as appropriate.

## PRAYER FOR RELIEF

WHEREFORE, the United States demands and prays that judgment be entered in favor of the United States:

1. On Counts I and II, under the False Claims Act, against Defendant Ingalls for treble (or, three times) the amount of the United States' actual damages (including investigative costs), plus civil penalties as are allowable by law for each false claim or record;

2. For all costs of this civil action; and

3. For such other and further relief as the Court deems just and equitable.

WHEREFORE, Relator Bryon Faulkner demands and prays that judgment be entered in his favor:

1. On Counts I - II, under the False Claims Act, for a percentage of all civil penalties and damages obtained from Ingalls pursuant to 31 U.S.C. § 3730, reasonable attorney's fees and litigation-related expenses and costs incurred on behalf of Faulker in the pursuit of his investigation and this case; and

2.  Such other relief as the Court deems just and proper.

This, the ___ day of July, 2013.

>                     Respectfully submitted,
>                     BRYON FAULKNER, Relator
>
>                     _____
>                     J. Brad Pigott (Mississippi Bar #4350)
>                     ATTORNEY FOR RELATOR

Brad Pigott, Esquire
J. Cliff Johnson, Esquire
Pigott & Johnson, P.A.
775 N. Congress Street
Post Office Box 22725
Jackson, Mississippi 39225-2725
Telephone: (601) 354-2121
Facsimile: (601) 354-7854

Michael Farrell, Esquire
Michael Farrett, PLLC
210 East Capitol Street, Suite 2180
Jackson, Mississipppi 39201-2306
Telephone: (601)948-8030